No. 18-12679

# In the United States Court of Appeals
## for the Eleventh Circuit

ART ROJAS, LUCINDA HALE, DANIEL HALE,
Plaintiffs – Appellees,

v.

CITY OF OCALA, FLORIDA, GREG GRAHAM, individually and in his official
capacity as chief of police of the Ocala Police Department,
Defendants – Appellants,

KENT GUINN, individually and in his official capacity as mayor of the City of
Ocala,
Defendant.

On Appeal from the United States District Court
for the Middle District of Florida

**APPELLANT CITY OF OCALA'S AMENDED OPENING BRIEF**

Abigail A. Southerland*
AMERICAN CENTER FOR LAW & JUSTICE
625 Bakers Bridge Ave., St. 105-121
Franklin, TN 37067
Tel. (615) 599-5572
Fax (615) 309-8832
asoutherland@aclj.org

Christina A. Compagnone*
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave. NE
Washington, DC 20002
Tel. (202) 641-9168
cstierhoff@aclj.org

Francis Manion
AMERICAN CENTER FOR LAW & JUSTICE
6375 New Hope Rd.
New Hope, KY 40052
Tel. (502) 549-7020
fmanion@aol.com

*Counsel for Defendants-Appellant*
* Admitted to Eleventh Circuit Bar

No. 18-12679, *Rojas v. City of Ocala*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26, counsel for Appellant City of Ocala certifies that the following have or may have an interest in the outcome of this case/appeal:

- American Center for Law & Justice (law firm for Appellant)

- American Humanist Association (law firm for Appellee)

- Chubb Limited (formerly ACE), parent company of Chubb North America

- Chubb North America

- City of Ocala (Appellant)

- Compagnone, Christina (Counsel for Appellant)

- Corrigan, Timothy J., presiding district court judge

- Gilligan, Patrick G., Esq. (Counsel for Appellant)

- Gilligan, Gooding, Batsel, Anderson & Phelan, P.A. (law firm for Appellant)

- Hale, Daniel (Appellee)

- Hale, Lucinda (Appellee)

- Manion, Frank (Counsel for Appellant)

No. 18-12679, *Rojas v. City of Ocala*

- Miller, Monica L., Esq. (Counsel for Appellee)

- Rojas, Art (Appellee)

- Sekulow, Jay (Counsel for Appellant)

- Sekulow, Jordan (Counsel for Appellant)

- Southerland, Abigail (Counsel for Appellant)


Dated: October 12, 2021          Respectfully Submitted,

                    /s/ Abigail Southerland
                    Abigail Southerland
                    AMERICAN CENTER FOR LAW & JUSTICE
                    625 Bakers Bridge Ave., St. 105-121
                    Franklin, TN 37067
                    Tel. (615) 599-5572
                    Fax (615) 309-8832
                    asoutherland@aclj.org

                    *Counsel for Defendants-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant City of Ocala respectfully requests oral argument. This case presents important questions regarding the interpretation of the Establishment Clause in light of Supreme Court precedent, and the City respectfully submits that oral argument is necessary for a full exposition of the legal issues and facts in the case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ............................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................ i

TABLE OF AUTHORITIES ............................................................. iv

JURISDICTIONAL STATEMENT .......................................... 1

STATEMENT OF THE ISSUES............................................... 1

STATEMENT OF THE CASE................................................. 2

I.    Introduction.................................................... 2

II.    Factual Background ....................................... 3

    A.    The Crime Spree and Events Leading Up to the Vigil ..................... 3

    B.    The Vigil....................................................... 9

    C.    Plaintiffs-Appellees' Involvement ..................... 11

III.    Procedural Background .............................. 12

IV.    Standard of Review..................................... 14

SUMMARY OF ARGUMENT .............................................. 14

ARGUMENT ...................................................... 15

I.    All Plaintiffs-Appellees Lack Standing ........................................................ 15

II.   Defendants' Actions Did Not Violate the Establishment Clause ................. 23

      A.    This Case Is Appropriately Analyzed Pursuant to Legislative
            Prayer Jurisprudence ............................................................... 24

      B.    Defendants' Conduct Did Not Violate The *Lemon* Test .................... 30

            1.    Defendants' secular purpose in addressing a crime spree is
                  undisputed, even by Plaintiffs ................................................. 30

            2.    Defendants' conduct did not have the effect of endorsement
                  of religion ................................................................................. 34

            3.    Defendants' conduct did not result in excessive government
                  entanglement ............................................................................. 39

III.  There Is No Evidence Supporting A Finding of Municipal Liability .......... 42

CONCLUSION ..................................................................................................... 43

CERTIFICATE OF COMPLIANCE ....................................................................... 45

CERTIFICATE OF SERVICE ............................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Abington Sch. Dist. v. Schempp*,
    374 U.S. 203 (1963)........................................................................ 32

*Accord Ala. Freethough Ass'n v. Moore*,
    893 F. Supp. 1522 (N.D. Ala. 1995) ........................................... 19

*Allen v. Consol. City of Jacksonville*,
    719 F. Supp. 1532 (M.D. Fla. 1989) ........................................... 35

*Am. Atheists, Inc. v. Levy County*,
    2017 U.S. Dist. LEXIS 198386 (N.D. Fla. Dec, 3, 2017)........................... 18

*Am. Atheists, Inc. v. Thompson*,
    2015 U.S. Dist. LEXIS 28779 (W.D. Okla. Mar. 10, 2015) ........................ 19

*\*Am. Legion v. Am. Humanist Ass'n*,
    139 S.Ct. 2067 (2019)............................................................. *passim*

*Am. Civ. Liberties Union v. Rabun Cnty. Chamber of Commerce, Inc.*,
    698 F.2d 1098 (11th Cir. 1983) .................................... 17, 20, 21, 23

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
    520 U.S. 397 (1997)........................................................................ 43

*Board of Education v. Allen*,
    392 U.S. 236 (1968)........................................................................ 32

*Bown v. Gwinnett Cnty. Sch. Dist.*,
    112 F.3d 1464 (11th Cir. 1997).............................................. 31, 39

*Carney v. Adams*,
    141 S. Ct. 493 (2020)..................................................................... 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................ 14

iv

*Cooper v. Dillon*,
403 F.3d 1208 (11th Cir. 2005) .................................................................. 42

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.
Amos*, 483 U.S. 327 (1987) ......................................................................... 30

*County of Allegheny v. ACLU*,
492 U.S. 573 (1989) .................................................................................... 25

*Denno v. Sch. Bd.*,
218 F.3d 1267 (11th Cir. 2000) .................................................................. 42

*Diamond v. Charles*,
467 U.S. 54 (1986) ...................................................................................... 17

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .............................................................................. 26, 31

*Engel v. Vitale*,
370 U.S. 421 (1962) .................................................................................... 32

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ...................................................................................... 32

*Everson v. Board of Education*,
330 U.S. 1 (1947) ........................................................................................ 32

*Gilfillan v. City of Philadelphia*,
637 F.2d 924 (3d Cir. 1980) ....................................................................... 35

*Glassroth v. Moore*,
335 F.3d 1282 (11th Cir. 2003) ............................................... 16, 20, 21, 34

*Hewett v. City of King*,
29 F. Supp. 3d 584 (M.D.N.C. 2014) ......................................................... 36

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ................................................. 24, 25, 31, 35

*Hunt v. McNair*,
    413 U.S. 734 (1973)......................................................................... 24

*Jaffree v. Wallace*,
    705 F.2d 1526 (11th Cir. 1983) ........................................ 24, 30, 31

*Kondrat'yev v. City of Pensacola*,
    949 F.3d 1319 (11th Cir. 2020) ........................................ 17, 20, 21

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982)......................................................................... 33

*\*Lemon v. Kurtzman*,
    403 U.S. 602 (1971)................................................................. *passim*

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................... 16, 19

*\*Lynch v. Donelly*,
    465 U.S. 668 (1984) ............................................................... *passim*

*\*Marsh v. Chambers*,
    463 U.S. 792 (1983)................................................................. *passim*

*McCreary County v. ACLU*,
    545 U.S. 844 (2005)......................................................................... 30

*Milwaukee Deputy Sheriffs' Ass'n v. Clarke*,
    588 F.3d 523 (7th Cir. 2009) ........................................................ 36

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978)......................................................................... 42

*Mueller v. Allen*,
    463 U.S. 388 (1983)......................................................................... 40

*Murray v. Buchanan*,
    720 F.2D 689 (D.C. Cir. 1983)..................................................... 27

*Nartowicz v. Clayton Cnty. Sch. Dist.*,
    736 F.2d 646 (11th Cir. 1984) ..................................................... 39

*Newdow v. Bush*,
    89 F. App'x 624 (9th Cir. 2004) ...................................................... 19

*Newdow v. Bush*,
    355 F. Supp 2d 265 (D.D.C. 2005) .......................................... 27, 31

*Newdow v. Bush*,
    391 F. Supp. 2d 95 (D.D.C. Sept. 14, 2005) ................................. 19

*Newdow v. Eagen*,
    309 F. Supp. 2d 29 (D.D.C. 2004) ................................................. 27

*Newman v. City of East Point*,
    181 F. Supp 2d 1374 (N.D. Ga. 2002) ........................................... 36

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ....................................................................... 42

*Saladin v. Milledgeville*,
    812 F.2d 687 (11th Cir. 1987) ....................................................... 21

*Shotz v. Cates*,
    258 F.3d 1077 (11th Cir. 2001) ..................................................... 16

*Smith v. Allen*,
    502 F.3d 1255 (11th Cir. 2007) ..................................................... 14

*Smith v. Board of Sch. Comm'rs*,
    827 F.2d 684 (11th Cir. 1987) ....................................................... 34

*Stone v. Graham*,
    449 U.S. 39 (1980) ......................................................................... 32

*Tilton v. Richardson*,
    403 U.S. 39 (1980) ......................................................................... 33

*\*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) ..................................... 18, 25, 26, 32, 41

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
    454 U.S. 464 (1982)........................................................................... 16, 17, 18

*Van Orden v. Perry*,
    545 U.S. 677 (2005)........................................................................ 24, 32, 41

*Walz v. Tax Comm'n of the City of New York*,
    397 U.S. 664 (1970)................................................................................ 32, 33

*Williamson v. Brevard County*,
    928 F.3d 1296 (11th Cir. 2019) .................................................................. 40

*Zorach v. Clauson*,
    343 U.S. 306 (1952)..................................................................................... 35

## Statutes

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1331 ............................................................................................. 1

## Rules & Regulations

Fed. R. Civ. P. 56(a).................................................................................... 14

## Constitutional Amendments

U.S. Const. amend. I .................................................................................... 23

## Other Authorities

Lee Edwards, *Presidential Prayers: Turning to God in Times of Need*,
    DAILY SIGNAL (April 6, 2020),
    http://www.dailysignal.com/2020/04/06/presidential-prayers-turning-
    to-god-in-times-of-need/................................................................................ 28

William J. Federer, *History of Prayer in America*,
https://www.nationaldayofprayer.org/history_of_prayer_in_america#:~
:text=History%20of%20Prayer%20in%20America.%20Days%20of%2
0Prayer,and%20his%20conscience%2C%20and%20so%20to%20humil
iation%20 (last visited June 22, 2021) ........................................................ 28

\* Citations upon which Defendants-Appellees-Cross/Appellants primarily rely are
marked with asterisks.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over this timely appeal under 28 U.S.C. § 1291. *See* Dkt. 91 (notice of appeal dated June 25, 2018); Dkt. 88 (Order disposing of all claims issued on May 24, 2018). As explained below, however, this case should be dismissed for lack of subject matter jurisdiction because Plaintiffs lack Article III standing.

## STATEMENT OF THE ISSUES

The Plaintiffs claim that the City of Ocala violated the Establishment Clause when its Chief of Police, Greg Graham, posted a flyer on the Ocala Police Department's Facebook page encouraging citizens to gather for a Community Prayer Vigil following a crime spree in the community resulting in the death of children. The Vigil was organized and put on by private citizens and volunteer chaplains for the Ocala Police Department. The issues presented on appeal are:

1. Whether Plaintiffs have standing to sue when they sought out, and voluntarily attended, the one-time Community Prayer Vigil and the only injury asserted is offense.

2. Whether City of Ocala or Chief Graham violated the Establishment Clause.

3. Whether A Finding of Municipal Liability Is Appropriate In This Case.

## STATEMENT OF THE CASE

### I.    Introduction

The present case arises from a September 2014 Community Prayer Vigil ("Vigil"), organized and led by local community leaders and private citizen members. The idea of the Vigil was presented following Ocala Police Department ("OPD") Chief Greg Graham's ("Graham")[1] request for assistance from members of Ocala's community, including the NAACP, in combatting a crime spree within the community that left several children seriously injured. The police knew the identity of the shooters, but could not persuade witnesses to come forward to testify. Consistent with Community Policing practices, Chief Graham met with the local NAACP leaders who suggested the OPD reach out to the local faith-based community for help in persuading witnesses to come forward. Chief Graham encouraged members in the community to attend the Vigil, just as he did for many other community-wide events. Throughout the planning of the Vigil by private citizens and a few city employees who participated in the planning in their personal capacity, Chief Graham expressly disavowed City/OPD sponsorship or

---

[1] Following the filing of the notice of appeal in this case, Defendant Greg Graham passed away on October 25, 2020. A suggestion of death for Defendant Graham was filed on January 25, 2021. Dkt. 112. No substitution of party has been filed.

responsibility for the Vigil and directed inquiring citizens to community leaders responsible for planning and hosting the event.

As more fully explained below, having manufactured the opportunity to be "offended," Plaintiffs lack standing to bring their Establishment Clause claim. Even if Plaintiffs did have standing, the undisputed material facts demonstrate that neither of the distinct activities of which Plaintiffs complain—the Facebook letter and the Vigil—violated the Establishment Clause of the First Amendment.

## II.    Factual Background

### A. The Crime Spree and Events Leading Up to the Vigil

Greg Graham served as the Ocala Chief of Police from 2012 until his death in 2020. Dkt. 52-1, at ¶¶ 2, 4. It is the role of local law enforcement in Ocala to "create and maintain a feeling of security," Dkt. 52-6, at 1, Ocala Police Department: Department Directive – Organization and Management, and fight crime in the community, *id.* The OPD "is committed to achieving its goals by collectively identifying the needs of the community coupled with developing a response to fulfill those needs." *Id.* The purpose of OPD is "accomplished through officer/community collaboration in identifying and solving crime and other problems." *Id.* This collaboration with the community is a nationally recognized method for maintaining order and fighting crime identified by the Department of Justice as Community Policing. Dkt. 52-7, at 1. Community Policing comprises

3

three important and necessary components, one of which includes community partnerships identified by the DOJ as "collaborative partnerships between the law enforcement agency and the individuals and organizations they serve to develop solutions to problems and increase trust in police." Dkt. 52-7, at 2.

During the fall of 2014, the City suffered a rash of shootings, which resulted in injury to two young children and an infant. Dkt. 52-5; Dkt. 52-1, at ¶ 5. The OPD responded to the 2014 crime spree by employing numerous methods to apprehend those responsible for the shootings and put an end to the crime spree. Dkt. 52-1, at ¶ 8; Dkt. 52-4, at ¶ 4. The police knew the identity of the shooters and some potential witnesses, but could not persuade witnesses to come forward to testify. Dkt. 54-10, at 21:1-18.[2] The police also knew that the witnesses and their families attended church. *Id*. In efforts to address the crime spree, Chief Graham and other members of the OPD engaged the community and conducted several meetings with citizens and neighborhood leaders. Dkt. 52-4, ¶ 4. Consistent with Community Policing practices, Chief Graham met with the local NAACP leaders who suggested the OPD reach out to the local faith-based community for help in persuading witnesses to come forward. Dkt. 52-1, at ¶ 6-7. Chief Graham therefore scheduled a meeting to discuss possible options and to brainstorm on how "to get the ministers in that area to lean on, talk to, encourage

---

[2] For all deposition transcripts cited to herein, the docket page number is provided.

witnesses to come forward" so that police could hold the perpetrators accountable. Dkt. 54-10, at 21:13-18. The meeting was attended by individual citizens active in the local faith-based community, including Narvella Haynes (community activist), Reverend Edwin Quintana and Hugh Brockington (religious leaders in the community and volunteer chaplains for the OPD) and Richard Edwards (an OPD Captain at the time and ordained deacon and active member in the faith community).  Dkt. 52-1, at ¶ 9; Dkt. 52-3 at ¶ 3.  During the meeting, Reverend Quintana suggested that a prayer vigil or similar event might bring the community together and encourage people to cooperate. Dkt. 52-1, at ¶ 10; Dkt. 52-3, at ¶ 5; Dkt. 52-2, at ¶ 6. Thereafter Chief Graham left the meeting, having no involvement in or knowledge of the planning of the Vigil. Dkt. 52-1, at ¶ 10, 12; Dkt. 52-15, at 2:22-4:21; 5:5-12.

Following the meeting, Quintana and Haynes presented Chief Graham with a letter they had drafted encouraging members of the community to support the Vigil. Dkt. 52-1, at ¶ 11; Dkt. 52-3, at ¶ 6; Dkt. 52-2, at ¶ 7. They asked Graham to co-sign the letter, along with Haynes, and post it to the OPD Facebook page to get the word out to as many people as possible. *Id*. The letter, addressed to all citizens, read:

> Blessings to all our citizens, specifically Pastors, Community Leaders, Parents and our precious youth.
>
> We are facing a crisis in the City of Ocala and Marion County that requires

fervent prayer and your presence to show unity and help in this senseless crime spree that is affecting our communities.

Within the last 30 days we have had numerous shootings that have resulted in two children and an infant being hit by bullets.

Stray bullets do not have respect for addresses, social status, economic status, educational background, political status and the list goes on. But my point is none of us are exempt from stray bullets.

I am urging you all to please support a very important "Community Prayer Vigil" that will be held this coming Wednesday, September 24, 2014 at 6:30 pm to be held at our Downtown Square located in the heart of the City. Please support peace and this appeal for unity on this very important "Community Prayer Vigil" coming this next Wednesday. We need you.

Dkt. 52-5.

Graham's purpose in signing and posting the Facebook letter was to obtain assistance from members of the community in apprehending criminals and ending a violent crime spree, not to act as a sponsor, organizer, or planner of the Vigil. Dkt. 52-1, ¶ 18. Quintana and Haynes took responsibility for further planning and organizing the Vigil with the help of Edwards. Dkt. 52-3, at ¶ 5; Dkt. 52-2, at ¶ 6; Dkt. 52-4, at ¶¶ 2-3. In communications with citizens leading up to the Vigil, Graham explained that he saw the Vigil as an opportunity to "bring our community together to fight crime" and "encourage those out there who have the information on who has committed these crimes . . . to come forward and provide witness testimony." Dkt. 52-9, at 3. Chief Graham also made very clear to Plaintiffs that reaching out to the faith-based community for assistance and expressing support for their idea of a vigil was one of many tactics used by OPD in combatting the crime spree. *Id*. Plaintiffs acknowledged, prior to the Vigil, their understanding of

Chief Graham's secular purpose for encouraging community support for the Vigil through the Facebook letter. Dkt. 52-10, at 1.

Chief Graham remained consistent in his communications with Plaintiffs and other citizens alike that the Vigil was a "'Community Prayer Vigil' not an Ocala Police Department or City of Ocala Prayer Vigil," Dkt. 54-40, at 6, and that he "had no say in whether it gets canceled or not." Dkt. 52-11, at 1; Dkt. 52-21; Dkt. 52-15, at 8:2-6 (explaining that "we" in early communications about the Vigil referred to the community, not OPD or the City). *See also* Dkt. 54-49, at 5 (Graham explaining, "I am not leading the event, I am not speaking at the event, I will be in attendance at the event."). Plaintiffs were fully aware of these communications by Chief Graham. *See* Dkt. 52-16, at 3:20-4:1 (affirming that she was aware of communications Ms. Porgal had with Defendants and that Ms. Porgal had communicated the gist of these communications to Ms. Hale). Chief Graham understood that if he attempted to cancel the event, as urged to do by Plaintiffs, he would be infringing on the constitutional rights of citizens. Dkt. 52-11; Dkt. 52-1, at ¶ 20. Chief Graham understood that there would be members of various faiths present at the Vigil, *see* Dkt. 52-15, at 9:5-12, and in response to a citizen's interest in participating, offered to connect him with one of the organizers of the Vigil. Dkt. 52-8. While the organizers apprised Chief Graham of information such as the date, time and location of the Vigil, *see* Dkt. 54-28, at 2; Dkt. 54-30, as citizens

8

hosting public events commonly do, *see* Dkt. 52-15, at 6:13-25, Graham had no knowledge regarding the details, including the line-up of speakers or the content to be offered at the Vigil. Dkt. 52-1, at ¶ 16.

Plaintiff Rojas understood, and has conceded, that Chief Graham had no control over whether to cancel the Vigil. Dkt. 52-18, at 8:7-13. The OPD and Chief Graham regularly encouraged citizens, including Plaintiffs, to attend events held in the Downtown Square. Dkt. 52-16, at 32:3-9; Dkt. 54-14, at 9:10-14:4 (Mr. Hale affirmed he was aware of other examples where the City made citizens aware of events taking place within the community). Plaintiffs have attended other events in the Downtown Square, *id.*, and understand that it is an area used by all groups to gather to have rallies, vigils, political speeches and other events. Dkt. 52-19, at 2:7-17; Dkt. 52-18, at 2:21-4:3 (Rojas stating that he understands there is a constitutional right to gather in public places and that the Vigil took place in a public square).

Mayor Guinn only became aware of the Vigil a few days before it occurred, Dkt. 52-20, at 8:8-18, and had no involvement with—or even knowledge of—the plans or details of the event. *Id.* at 2:10-19; 3:4-6; 9:24-14:6. *See also* Dkt. 52-13, at #1. *See also*, Dkt. 52-1, at ¶¶ 13-15; Dkt. 52-2, at ¶ 10. Similarly, Mayor Guinn had no knowledge of or involvement with the origins of the Facebook letter. Dkt. 52-20, at 4:8-5:8; Dkt. 52-13, at # 2. Mayor Guinn testified that upon learning of

the Vigil, he did not think it was an OPD vigil but "just a prayer vigil." Dkt. 52-20, at 9:24-11:6. Mayor Guinn attended the Vigil but did not lead or participate in any official manner. *Id.* at 6:2-7:2. The Ocala City Council was not involved in planning, organizing, or sponsoring the Vigil. Dkt. 52-3, at ¶ 11.

Quintana asked other OPD chaplains to attend and/or participate in the Vigil and informed Chief Graham of his intention to do so. Dkt. 52-3, at ¶ 8; Dkt. 52-1, at ¶ 16. Quintana was responsible for inviting other members of the local faith-based community to speak at the Vigil. Dkt. 52-3, at ¶ 7; Dkt. 52-14, at # 25(c). No OPD official or employee planned or participated in any aspect of the Vigil in any official capacity, including in determining who would lead or participate in the Vigil, or the content of any speech at the Vigil. Dkt. 52-3, at ¶ 10; Dkt. 52-1, at ¶ 24.

B.  The Vigil

The Vigil took place on September 24, 2014[3] in the Downtown Square in Ocala, a public space where meetings, rallies, assemblies and other public and privately-sponsored events occur. Dkt. 88, at 16 (citing Dkt. 52-1 at ⌐ 22). Approximately ten people were on stage for the event including a few volunteer

---

[3] See Dkt. 88, at 4 n.2 (noting initial confusion regarding exact date of Vigil and properly concluding that the Vigil occurred on September 24).

OPD Chaplains in uniform and several private citizens (including community leaders and one off-duty officer in plain clothes). Dkt. 54-6, at 3; Dkt. 52-3, at ¶ 9.

At the Vigil, words of prayer and encouragement were given from the stage. Dkt. 52-2, at ¶ 11. Songs were also sung; although the record includes mention of only one, "God Bless America." Dkt. 88, at 16 (citing several sources). No on-duty, uniformed OPD officers and no city officials spoke or led prayer on the stage during the Vigil. Dkt. 52-1, at ¶ 25. Chief Graham, as well as a few uniformed officers, were present at the Vigil to engage members of the community and attempt to enlist their help with the crime spree in the city. *Id.* at ¶ 21. Their presence was in keeping with the OPD's overall objective of engaging the community to combat crime and is common for public gatherings downtown. *Id.* at ¶ 26. Plaintiff Hale does not recall any mention of or reference to the police department by anyone on stage during the Vigil. Dkt. 54-14, at 38:23- 39:55.

Volunteer OPD chaplains are not compensated and serve on a voluntary basis. Dkt. 52-6. This fact was clearly communicated to Plaintiffs at the Vigil. Dkt. 54-12, at 20:23-23:7. Volunteer chaplains wear – and at the Vigil wore – uniforms that are clearly distinguishable from those worn by sworn OPD officers. *see* Dkt. 52-3, at ¶ 9; Dkt. 52-6. Plaintiffs knew the individuals in uniform on the stage at the Vigil were chaplains, not OPD officers. Dkt. 52-19, at 3:24-4:10; Dkt. 52-17, at 3:20-4:25. *See also* Dkt. 52-18, at 6:5-16.

As Chief Graham explained prior to the Vigil taking place, and as the organizers of the event have since affirmed, no funds were used from the public treasury for the Vigil. Dkt. 52-11; Dkt. 52-2, at ¶ 12; Dkt. 52-3, ¶ 12.

C. Plaintiffs-Appellees' Involvement[4]

Prior to the Vigil, Plaintiff Daniel and Lucinda Hale had never attended any other public gathering in the public square in Ocala. Dkt. 54-15, at 31:19-32:2. Prior to learning of the Facebook post inviting citizens to attend the Vigil, Ms. Hale had never visited the OPD's Facebook page. Dkt. 54-15, at 10:2-8. Only upon hearing about the Facebook post, the Hales visited the OPD's Facebook page to view it. *Id*. Mr. and Mrs. Hale affirmed that they attended the Vigil voluntarily because they "wanted" to attend and observe what occurred – not because they wanted to participate in the Vigil. In response to an interrogatory, "Identify YOUR reason(s) for attending the Community Prayer Vigil," Mrs. Hale responded, "I attended because I wanted to observe what happened, see how religious it would be, and see the extent of city and police involvement. I also felt that my presence would be a form of protest." Dkt. 54-3, at #12. Similarly, Mr. Hale stated, "I attended because I wanted to observe." Dkt. 54-4, at #12. Mrs. Hale explained that she shares the concern of other members in the community to alleviate crime. Dkt. 54-3, at # 8. Mr.

---

[4] As the lower court noted in its Order, *see* Dkt. 88, at 20 n.11, Ms. Porgal was a plaintiff in this case until she passed away in January 2017. *See* Dkt. 69. She was subsequently terminated as a party. *See* Dkt. 72.

Hale testified that no city official indicated any form of penalty for failure to attend or participate in the Vigil. Dkt. 52-17, at 5:19-24. Mr. Hale spoke with Chief Graham at the Vigil, and discussed the possibility of volunteer work with the OPD in the future. Dkt. 54-14, at 35:4-25. In fact, shortly after the Vigil, Chief Graham invited the Hales and Ms. Porgal to an anti-bullying rally, which they attended, scheduled to take place in the same location as the Vigil. Dkt. 54-14, at 55:15-20; Dkt. 54-15, at 31-32:15.

Plaintiff Art Rojas lives in Ocala and attended the Prayer Vigil to determine whether there would be a violation of the Establishment Clause. Dkt. 54-12, at 31:8-13. In response to an interrogatory request to identify all facts to support the allegation that he was treated as an unwelcome member of the community, Mr. Rojas could not provide any such facts except to say that "[m]y understanding is that direct contact with an Establishment Clause violation is itself harm" and the vigil was "not a comfortable place for non-believers like myself." Dkt. 54-1, at #14. Mr. Rojas does not explain whether he, in fact, felt uncomfortable or his reasoning why. *Id*. There is no record of Mr. Rojas having viewed the Facebook post. *See generally*, Dkt. 88.

### III.   Procedural Background

Following the September 24, 2014 Vigil, Plaintiffs filed suit against the City of Ocala, Greg Graham (then Chief of Police) and Mayor Guinn on November 11,

2014, alleging Defendants violated the Establishment Clause of the First Amendment by coordinating with community leaders to address a crime spree, encouraging the community to attend the event (as it did often for events held in the public square) and allowing private citizens to fund and organize a Community Vigil attended by hundreds of people in the community. On September 9, 2016, Defendants City of Ocala and Greg Graham moved for summary judgment, Dkt. 52, and shortly thereafter on September 20, 2016, Plaintiffs moved for summary judgment, Dkt. 54. On May 24, 2018, the district court ruled on the parties' motion for summary judgment and granted summary judgment to Plaintiffs as to their claims against Defendant Chief Graham and the City of Ocala finding that (1) Plaintiffs had standing despite the fact that the Vigil was a one-time event that was neither hosted nor funded by Defendants, Plaintiffs – two of whom do not live in the City of Ocala --voluntarily participated in the event , and Plaintiffs admit that they attended the event with the specific purpose of observing what they believed would be a violation of the Establishment Clause; (2) Defendants "organized" and "sponsored" the Vigil in violation of the First Amendment, despite a complete lack of evidence that any City funding was utilized and anyone employed by the City organized, sponsored or participated in the event in their official capacity; (3) the City was liable under the theory of municipal liability for this one-time event; and (4) Chief Graham is not entitled to qualified immunity because his actions violate clearly established law

(despite the undisputedly unclear nature of Establishment Clause precedent and absence of any case directly on point). The district court denied Defendants City of Ocala and Greg Graham's motion for summary judgment in full.[5]

## IV.    Standard of Review

This Court reviews a district court's grant of summary judgment de novo, viewing all facts in the light most favorable to the non-moving party. *Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir. 2007). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See e.g. Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## SUMMARY OF ARGUMENT

This case should have been dismissed because Plaintiffs lack standing. All Plaintiffs have confirmed that they learned of the event from someone else and attended the one-time Vigil voluntarily with the sole purpose of observing what they believed would be an Establishment Clause violation. The only injury alleged is that of offense and/or disagreement with prayer and the religious activities taking place at the Vigil.

---

[5] The court denied Plaintiffs' summary judgment as to their claim against Mayor Guinn and granted Mayor Guinn's Motion for Summary Judgment.

Even assuming the Court reaches the merits, Defendants' actions do not violate the Establishment Clause. Supreme Court precedent is clear that the present case should be analyzed pursuant to legislative prayer jurisprudence, which affirms that Defendants' actions in encouraging citizens to gather for prayer following a crime spree is consistent with tradition long followed in our Nation. Defendants' actions are likewise constitutional under the *Lemon* test, because encouraging citizens to attend the Vigil had a secular purpose and effect of cooperating with community leaders to encourage crime witnesses whom the police knew were part of the faith community to come forward and identify the shooter(s) guilty of injuring three members in the community.

## ARGUMENT

### I.    All Plaintiffs-Appellees Lack Standing

The decision below should be reversed because all Plaintiffs-Appellees lack standing. The lower court found Appellees satisfied the jurisdictional standing requirements regarding an injury-in-fact using analysis from monument cases, *see* Dkt. 88 at 25-26, and failed to consider the following undisputed facts: 1) the Appellees sought out the allegedly offensive conduct, (2) the Appellees voluntarily and purposefully exposed themselves to the conduct, (3) the Vigil was a one-time, non-compulsory event not at all analogous to a monument display; and

(4) Appellees' own testimony disputed the contention that they felt excluded from the community.

As the Supreme Court has made clear, the elements of standing "are not mere pleading requirements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). They are "an indispensable part of the plaintiff's case" that must be supported with "the manner and degree of evidence required at the successive stages of the litigation." *Id*. At issue here is Article III standing. Article III of the United States Constitution "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury *as a result of* the putatively illegal conduct of the defendant,' and that the injury 'fairly *can be traced to* the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (internal citations omitted) (emphases added); *see also Shotz v. Cates*, 258 F.3d 1077, 1081 (11th Cir. 2001).

In an Establishment Clause case, "the plaintiffs must identify a 'personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct.'" *Glassroth v. Moore*, 335 F.3d 1282, 1292 (11th Cir. 2003) (quoting *Valley Forge*, 454 U.S. at 485) (emphasis omitted). Mere "non-observance of the Constitution" is not a sufficient injury to confer standing. *Valley Forge*, 454 U.S. at

17

482 (dismissing Plaintiffs' suit for lack of standing because they failed to identify any injury more than simply a psychological consequence associated with the knowledge that a constitutional wrong may be occurring). "Neither a mere spiritual stake in the outcome nor an intense commitment to separation of church and state is a 'permissible substitute for a showing of injury itself.'" *Am. Civ. Liberties Union v. Rabun Cnty. Chamber of Commerce, Inc.,* 698 F.2d 1098, 1103 (11th Cir. 1983) (quoting *Valley Forge*, 454 U.S. at 486).

Since this Court's decision in *Rabun County*, the Supreme Court has "consistently tightened standing requirements." *Kondraty'yev v. City of Pensacola*, 949 F.3d 1319, 1336 (11th Cir. 2020) (Newsom, J. concurring). Most notably, the Supreme Court has "rejected the notion that offense alone qualifies as a 'concrete and particularized' injury sufficient to confer standing." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2099 (2019) (Gorsuch, J. concurring) (citing *Diamond v. Charles*, 476 U. S. 54 (1986), and noting "[w]e could hardly have been clearer: 'The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.'").[6] The Establishment Clause is no exception to this rule. *Am. Legion*, 139 S. Ct. at 2100 (Gorsuch, J.

---

[6] Indeed, the Supreme Court "has held offense alone insufficient to convey standing in analogous—and arguably more sympathetic circumstances." *Am. Legion*, 139 S. Ct. at 2099 (Gorsuch, J. concurring) (collecting cases).

concurring) ("the Court has expressly rejected 'offended observer' standing under the Establishment Clause," because "[o]ffended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III") (citing *Valley Forge,* 454 U.S. 464)). *See also Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) ("[R]espondents stated that the prayers gave them offense and made them feel excluded and disrespected. Offense, however, does not equate to coercion.").

Here, while Plaintiffs-Appellees may have "encountered speech they find disagreeable," *id*. at 589, their sense of affront from the expression of religious views held by many in their community is not sufficient to confer standing.

Additionally, purposeful or "contrived" encounters – *i.e*. those that are neither unavoidable nor regular – do not suffice to establish standing in Establishment Clause cases. "The Supreme Court has explained that a plaintiff's 'claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal [his] discoveries in federal court.'" *Am. Atheists, Inc. v. Levy County*, 2017 U.S. Dist. LEXIS 198386, *10 (N.D. Fla. Dec. 3, 2017) (quoting *Valley Forge*, 454 U.S. at 487). As the *Levy County* court explained, "[a]ny injury in this context would be contrived, and [t]he Supreme Court has declined to find standing in contrived circumstances." *Id.* (internal quotations and citation omitted). "For this reason," the court went on, "courts have held that a plaintiff does not have standing to bring an

19

Establishment Clause claim against a monument that the plaintiff purposefully encountered." *Id; Accord Ala. Freethought Ass'n v. Moore*, 893 F. Supp. 1522, 1535 n.26 (N.D. Ala. 1995) ("This court cannot understand how voluntary exposure to purportedly offensive conduct can establish standing to obtain an injunction barring such conduct. To recognize standing in such circumstances would be to allow a plaintiff to 'manufacture' her standing. Such a clever machination (or is it masochism), if recognized as legitimate, would make a mockery of the longstanding judicial interpretation of Article III's 'case or controversy' requirement.") (citing *Lujan*, 504 U.S. at 565 n.2 ("Imminence . . . has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, *and the acts necessary to make the injury happen are at least partly within the plaintiff's own control*") (emphasis added)). *See also Am. Atheists, Inc. v. Thompson*, 2015 U.S. Dist. LEXIS 28779, **5-6 (W.D. Okla. Mar. 10, 2015) (rejecting standing where plaintiff's "testimony was clear that she went out of her way to find the monument"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 104 (D.D.C. Sept. 14, 2005) (dismissing challenge to the inclusion of a prayer in the 2001 Presidential Inauguration for lack of standing where the inauguration is a one-time event held every four years and, thus, Newdow did not come in regular contact with prayer, and Newdow had to go out of his way to either watch it on television or travel to Washington, D.C.); *Newdow v. Bush*, 89 F. App'x 624, 625 (9th Cir. 2004)

(dismissing the same challenge – *i.e.* inclusion of prayer offered by Rev. Franklin Graham at the inauguration – for lack of standing where Newdow failed to allege a sufficiently concrete and specific injury).

Indeed, this Court has found standing in Establishment Clause cases only where the alleged injury-in-fact is unavoidable and/or regularly occurring – neither of which is present in this case. In *Glassroth*, this Court held that plaintiffs had suffered an injury-in-fact because they regularly assumed special burdens to avoid a monument. 335 F.3d 1282, 1292 (11th Cir. 2003). The plaintiffs were "attorneys whose professional duties require[d] them to enter the Judicial Building regularly, and . . . must pass by the monument." *Id*. This Court found that the monument was unavoidable for the plaintiffs in their daily duties and that plaintiffs "altered their behavior" and "incurred expenses," such as purchasing online research tools and hiring staff for filing purposes, to avoid visiting the judicial building. *Id.* Notably, the court declined to consider whether the other plaintiffs – who did not alter their behavior as a result of the monument – had standing. *Id*. at 1292-93. Similarly, in *Rabun County*, the plaintiffs were campers who refused "to camp in the [state] park because of the [presence of the] cross." *Rabun Cnty.*, 698 F.2d at 1108. There, the plaintiffs established standing because they "suffered 'as a consequence'" from the display by having to alter their behavior of camping in the park. *Id.* Finally, in *Kondrat'yev*, this Court found standing for only one of the plaintiffs where testimony

was provided that he *often* witnessed a religious display while using the park. *Kondrat'yev*, 949 F.3d at 1324 (noting that plaintiff Ryland testified that he uses Bayview Park "many times throughout the year").[7] *See also Saladin v. Milledgeville*, 812 F.2d 687, 692 (11th Cir. 1987) (explaining that "non-economic injury which results from a party being subjected to *unwelcome* religious statements" *may* be sufficient to demonstrate injury and finding standing where "plaintiffs *regularly* receive correspondence on city stationary bearing the seal" ) (Emphasis added).

Unlike in *Glassroth* and *Rabun County*, Appellees in this case did not alter their behavior or incur any expenses to avoid the Vigil. Instead, all three Appellees unequivocally confirm through their own sworn statements and testimony that they intentionally took pains—*i.e.*, went out of their way—to come *into* contact with the allegedly offensive conduct for the express purpose of observing what they fully expected to be offensive conduct. Furthermore, as opposed to the situation in *Kondrat'yev*, there was no regular contact, nor could there be, as the Vigil was a one-time event. Appellees in this case cannot establish standing.

---

[3] While there appears to be a conflict between Supreme Court precedent and the Eleventh Circuit's acceptance that some "metaphysical" or "spiritual" harm suffices to establish standing, *see Kondrat'yev*, 949 F.3d at 1336 (Newsom, J. concurring), this conflict need not be addressed here where Plaintiffs-Appellees do not allege any such metaphysical or spiritual harm and the alleged injury is distinguishable from the ones asserted in *Rabun County* and *Kondraty'yev*.

The Hales indicate they first heard about the Facebook post and the Vigil via word of mouth from someone else. Only then did they decide to view the Facebook post. There was no unavoidable contact. Furthermore, the Hales were not part of the Ocala community as they do not live in Ocala. The Hales' decision to attend the Vigil was entirely voluntary and for the sole purpose of suing the City. Mrs. Hale, when asked to explain all reasons for attending the Vigil, responded, "I attended because I wanted to observe what happened, see how religious it would be, and see the extent of city and police involvement. I also felt that my presence would be a form of protest." Dkt. 54-3, at #12. Similarly, Mr. Hale stated, "I attended because I wanted to observe." Dkt. 54-4, at #12. Further, while the mere feeling of exclusion is insufficient to establish standing, Mr. Hale's testimony disputes any such feeling. As Mr. Hale testified, he spoke personally with Chief Graham during the event about volunteering with the police department, which hardly supports his assertion that he felt singled out and excluded as an outcast at the Vigil. In fact, shortly after the Vigil, Chief Graham invited the Hales and Ms. Porgal to attend an anti-bullying rally scheduled to take place in the same location as the Vigil, and they attended.

Mr. Rojas's attempts to establish standing are even more contrived. There is no evidence that Mr. Rojas even viewed the Facebook post. And Rojas never indicated any interest in participating in the common purpose of fighting crime. Mr. Rojas stated the sole reason for attending the event was to "observe what was going

23

on," and to determine whether there were going to be violations of the Establishment Clause.

In sum, the Plaintiffs sought out what they perceived would be offensive conduct and attended for the sole purpose of viewing that allegedly offensive conduct in order to bring suit. Such conduct on the part of a plaintiff constitutes an attempt to manufacture standing that cannot satisfy Article III's jurisdictional requirements. *See also Carney v. Adams*, 141 S. Ct. 493 (2020) (no standing where plaintiff voluntarily took pains to manufacture the alleged harm).

## II.    Defendants' Actions Did Not Violate the Establishment Clause.

The Establishment Clause of the First Amendment prohibits "law[s] respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. As the Supreme Court recently noted, with the exception of the formal establishment of a church by government, "pinning down the meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem." *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2080 (2019). Some time ago, the Supreme Court attempted to devise a test - the *Lemon* test - to assist in Establishment Clause decision making. This three-part test considers "(1) whether the action has a secular purpose; (2) whether the 'principal or primary effect' is one which neither 'advances nor inhibits religion;' and (3) whether the action fosters 'an excessive government entanglement with religion.'" *Rabun*

24

*Cnty.*, 678 F.2d at 1389 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). However, this test has been "harshly criticized by Members of this Court, lamented by lower courts, and questioned by a diverse roster of scholars" because it fails to "explain the Establishment Clause's tolerance" for a host of religious practices including "prayers that open legislative meetings, . . . certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or that attention paid to the religious objectives of certain holidays, including Thanksgiving." *Am. Legion*, 139 S. Ct. at 2080-81. Accordingly, the *Lemon* facts now serve "as no more than helpful signposts." *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (citing *Hunt v. McNair*, 413 U.S. 734, 741 (1973)).

A. This Case Is Appropriately Analyzed Pursuant to Legislative Prayer Jurisprudence.

In deciding this case, the lower court declined to apply legislative prayer jurisprudence and, instead, analyzed the present case under the *Lemon* test using a hybrid analysis of school prayer[8] and monument cases. Dkt. 88, at 33 n.16 (citing

---

[8] While the lower court initially acknowledges that this case "is not a school prayer case," Dkt. 88*,* at 33, it devotes a great deal of analysis to the school prayer case of *Holloman* to uphold its recurring theme that because the facts in this case involve prayer, it can reach only one conclusion: Defendants' purpose and perceived involvement was wholly religious and, thus, improper. *See id*., at 1; *id*. at 29 (citing *Holloman*, 370 F.3d at 1268 (school prayer case); *id*. at 32 (citing *Holloman* and *Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983) (another school prayer case); *id*. at 34 (acknowledging that the Chief's original purpose was to combat

*County of Allegheny v. ACLU*, 492 U.S. 573, 603 n. 52 (1989) for the proposition

that "[l]egislative prayer does not urge citizens to engage in religious practices, and

on that basis could well be distinguishable from an exhortation from the government

to the people that they engage in religious conduct," *abrogated on other grounds by*

*Town of Greece*, 572 U.S. 565). *See also* Dkt. 88, at 32-34 (citing *Hollomon v.*

*Harland*, 370 F.3d 1252, 1285 (11th Cir. 2004)). The landscape of Establishment

jurisprudence, however, has changed significantly in recent years.

In *Town of Greece*, the Supreme Court distinguished school prayer cases,

which almost always contain an element of coercion, from legislative prayer cases

where adults and constituents are

> "free to enter and leave with little comment and for any number of
> reasons." *Lee* [*v. Weisman*], 505 U.S. [577] at 597 [2014]. Should
> nonbelievers choose to exit the room during a prayer they find
> distasteful, their absence will not stand out as disrespectful or even
> noteworthy. And should they remain, their quiet acquiescence will not,
> in light of our traditions, be interpreted as an agreement with the words
> or ideas expressed. Neither choice represents an unconstitutional
> imposition as to mature adults, who 'presumably' are 'not readily
> susceptible to religious indoctrination or peer pressure.'"

572 U.S. at 590-91 (quoting *Marsh v. Chambers*, 463 U.S. 792, 793 (1983)). *See*

---

crime and citing numerous facts to support the secular purpose, but summarily
concluding nonetheless that the "overall religious nature of the event" supports "a
commonsense conclusion that a religious objective permeated" the event); *id.* at 35
(citing *Holloman* again in support of finding against Defendants under the second
*Lemon* prong); *id.* at 39 (citing *Holloman* for position that "prayer that is led,
encouraged, or facilitated by school personnel is constitutionally prohibited").

*also Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (also distinguishing legislative and school prayer cases because, unlike legislative prayer, "free public education was virtually nonexistent at the time the Constitution was adopted").

Following *Town of Greece* and the district court's decision in this case, the Supreme Court decided *American Legion* – declining to apply the *Lemon* test to yet another category of Establishment Clause challenges: monuments. In doing so, the Supreme Court noted the growing number of cases that now fall outside application of the *Lemon* test. *Am. Legion,* 139 S. Ct. at 2080 (plurality) ("If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met. In many cases, this Court has either expressly declined to apply the test or has simply ignored it.") (collecting cases)). As the Court further explained,

> This pattern is a testament to the *Lemon* test's shortcomings. As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the Lemon test could not resolve them. It could not "explain the Establishment Clause's tolerance, for example, of the prayers that open legislative meetings, . . . certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving." *Van Orden*, *supra*, at 699, 125 S. Ct. 2854 (opinion of BREYER, J.).

*Id.* at 2080-82 (plurality). Pertinent here, the Court explained that "the *Lemon* test presents particularly daunting problems in cases . . . that involve the use, for

27

ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* at 2081 (plurality). Pursuant to *American Legion*, for cases involving longstanding monuments, symbols and practices, there is a presumption of constitutionality. *Id*. *American Legion* served as the final proverbial nail in the coffin for application of the *Lemon* test to the present case.

While prayer in schools may still pose significant challenges and warrant closer scrutiny, cases such as the present one do not. The district court's assertion that prayer is quintessentially religious and, thus, *per se* unconstitutional in the case at hand highlights one of many errors in the court's analysis. Courts have routinely upheld government involvement in and/or association with prayer in other contexts, including legislative prayer, prayer in the military, prayers offered by chaplains and calls to prayer following a crime spree or other tragic event. *See Am. Legion*, 139 S. Ct. at 2088 ("the Establishment Clause permits a nondiscriminatory prayer at the beginning of a town council session"); *Marsh,* 463 U.S. at 793 (upholding legislature's practice of opening sessions with a prayer offered by a chaplain paid with public funds); *Newdow v. Bush*, 355 F. Supp. 2d 265, 285-86 (D.D.C. 2005) (citing *Murray v. Buchanan*, 720 F.2d 689, 689 (D.C. Cir. 1983) (en banc)) (upholding prayer by a paid legislative chaplain at the United States Congress); *Newdow v. Eagen*, 309 F. Supp. 2d 29 (D.D.C. 2004) (upholding prayer by a military chaplain at Army bases).

Just as in *Marsh*, Defendants' conduct encouraging citizens to gather for prayer amid a difficult time in the community is a practice "deeply embedded in the history and tradition of this country." 463 U.S. at 786. In 1668, the Virginia House of Burgesses in Jamestown passed an ordinance designating: "The 27th of August appointed for a Day of Humiliation, Fasting and Prayer, to implore God's mercy."[9] In 1746, Massachusetts Governor William Shirley declared a Day of Prayer and Fasting on October 16, 1746 in advance of an anticipated attack by the French.[10] A call to prayer was made by President Andrew Johnson following Lincoln's assassination.[11] When announcing that D-Day had arrived and the invasion of France was underway, Roosevelt ended his national radio address with the following prayer

> Almighty God: Our sons, pride of our nation, this day have set upon a mighty endeavor, a struggle to preserve our Republic, our religion, and our civilization, and to set free a suffering humanity. Some will never return. Embrace these, Father, and receive them, Thy heroic servants, into Thy Kingdom.[12]

---

[9] William J. Federer, *History of Prayer in America*, https://www.nationaldayofprayer.org/history_of_prayer_in_america#:~:text=History%20of%20Prayer%20in%20America.%20Days%20of%20Prayer,and%20his%20conscience%2C%20and%20so%20to%20humiliation%20 (last visited June 22, 2021).

[10] *Id*.

[11] *Id*.

[12] Lee Edwards, *Presidential Prayers: Turning to God in Times of Need*, DAILY SIGNAL (April 6, 2020), http://www.dailysignal.com/2020/04/06/presidential-prayers-turning-to-god-in-times-of-need/.

Likewise, President Reagan made the National Day of Prayer the first Thursday in May, announcing "Americans in every generation have turned to their Maker in prayer . . . We have acknowledged . . . our dependence on Almighty God."[13] And following the attacks on the World Trade Center and the Pentagon in September 2001, President George W. Bush asked the nation to pray for the victims.[14] Finally, while attending a National Prayer Breakfast, President Barack Obama noted what an important time it was to have "Jesus standing beside us, steadying our minds, cleansing our hearts, pointing us toward what matters."[15]

In sum, Defendants' conduct "fit[s] within the tradition long followed" by leaders in our Nation. *Am. Legion*, 139 S. Ct. 2088 (quoting *Town of Greece*, 572 U.S. at 577). Chief Graham responded to a crime spree by employing numerous methods, including the long-applauded method of community policing. He met with faith leaders in the community (at the behest of the NAACP) and then vocalized support for the Vigil that community leaders planned and funded.

---

[13] *Id.*

[14] Speaking from the Oval Office, President Bush stated, "I ask for your prayers for all those who grieve, for the children whose worlds have been shattered, for all whose sense of safety and security have been threatened. And I pray they will be comforted by a Power greater than any of us, spoken through the ages in Psalm 23: 'Even though I walk through the valley of the shadow of death, I fear no evil for you are with me.'" *Id*.

[15] *Id.*

B. Defendants' Conduct Did Not Violate the *Lemon* Test

Even if *Lemon* applied to the facts in this case, the conduct of Defendants would not violate any prong of the *Lemon* test.

### 1. Defendants' secular purpose in addressing a crime spree is undisputed, even by Plaintiffs.

The *Lemon* test first requires "that the law [or action] at issue serve a 'secular legislative purpose.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987). The Supreme Court has made clear that "[t]his does not mean that the law's purpose must be unrelated to religion" in order to pass the first prong of the test. *Id*. at 336. A court will find that the purpose of a state action violates the *Lemon* test *only* when "the government acts with the ostensible and *predominant* purpose of advancing religion. . . ." *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (emphasis added) (citations omitted). This is particularly important here where the lower court held that the City failed this first prong because "[p]rayer is the quintessential religious practice which implies that no secular purpose can be satisfied," any government official's support for prayer is *per se* unconstitutional. *See* Order (Dkt. 88), at 32 (citing *Jaffree v. Wallace*, 705 F.2d 1526, 1534-35 (11th Cir. 1983) and *Hollomon*, 370 F.3d at 1285). The district court's reasoning is problematic for two reasons. First, the cases relied upon by the district court are inapposite here. In *Jaffree*, "the primary sponsor of the Alabama statute and the Governor of Alabama

both explicitly conceded that the purpose of the Alabama statute was to return prayer to the Alabama schools, and Alabama failed to present any evidence of a secular purpose." *Bown v. Gwinnett Cnty. Sch. Dist.*, 112 F.3d 1464, 1471 (11th Cir. 1997) (citing *Jaffree*, 472 U.S. at 57 & n.44, and distinguishing it from the facts in *Bown* where legislators had various reasons for voting for the statute to implement a moment of silence in the school day). Further, the actor here is not a school official and the plaintiff is not a pupil, as was the case in *Holloman*. As one court aptly noted, "[t]he Supreme Court has frequently emphasized the unique problems posed by prayer in schools, and it is plain from a reading of *Lee* and the other decisions cited by Newdow that the Court believed that its school prayer decisions could co-exist with its endorsement of ceremonial deism in *Marsh*." *Newdow*, 355 F. Supp. 2d at 285-86 (citing *Lee*, 505 U.S. at 596 ("Inherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh v. Chambers*"); *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (emphasizing that *Marsh* analysis "is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.")). Once more, the district court, in holding that a reasonable observer could only conclude that "the Prayer Vigil had a religious purpose," overlooked evidence that

Plaintiffs actually acknowledged that they understood the primary purpose to be community policing).

Second, courts have routinely upheld prayer by government officials and legislative bodies, as well as religious monuments. *See Town of Greece,* 572 U.S. at 575 ("legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause"). Accordingly, "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (upholding display of Ten Commandments on the Texas State Capitol grounds) (citations omitted). Where a religious purpose is mixed with a secular purpose, such conduct does not violate the Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984). "The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, *but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations*." *Id*. (emphasis added) (citing *Stone v. Graham,* 449 U.S. 39, 41 (1980); *Epperson v. Arkansas*, 393 U.S. 97, 107-09 (1968); *Abington School District v. Schempp,* 374 U.S. 203, 223-24 (1963); *Engel v. Vitale*, 370 U.S. 421, 424-25 (1962)). "Even where the benefits to religion were substantial, as in *Everson v. Board of Education*, 330 U.S. 1 (1947); *Board of Education v. Allen*, 392 U.S. 236 (1968); *Walz* [*v. Tax Comm'n*

33

*of City of New York.*, 397 U.S. 664 (1970)]; and *Tilton* [*v. Richardson*, 403 U.S. 672 (1971)], we saw a secular purpose and no conflict with the Establishment Clause." *Lynch*, 465 U.S. at 680 (citing *Larkin v. Grendel's Den, Inc*., 459 U.S. 116 (1982)).

Here, the secular purpose – *i.e.* to fight crime and catch the culprit – remained clear and understood by all, including the Plaintiffs from the first posting on Facebook to the Vigil itself. Even the lower court acknowledged that the Chief's purpose was to combat crime. Dkt. 88, at 34 (citing numerous facts to support the secular purpose). Chief Graham's decision to meet with and involve the NAACP and faith leaders in this effort was one of many methods employed by the City to address the crime spree and was consistent with the City's long-time practice of community policing. From these meetings, the Vigil was proposed by community leaders and volunteers, not by Chief Graham or other City officials. Every action by Chief Graham thereafter – from the Facebook post to the Vigil – reiterated and supported the secular purpose. Any contention that the event was motivated "wholly [or even in part] by religious considerations," *Lynch*, 465 U.S. at 680, simply isn't supported by the evidence presented in this case. Indeed, even Plaintiffs admit that, despite their disapproval of the letter, they were not confused about Chief Graham's crime-fighting purpose for encouraging citizens to attend the Vigil.

34

The facts of this case consistently and undisputedly point to a secular purpose.

### 2. *Defendants' conduct did not have the effect of endorsement of religion.*

The second prong of the *Lemon* test – the effect prong – "asks whether the practice under review in fact conveys a message of endorsement or disapproval of religion to an *informed, reasonable* observer." *Glassroth v. Moore*, 335 F.3d 1282, 1297 (11th Cir. 2003) (quotation, citation and alteration omitted). To show a violation of this prong, it is not sufficient "that government conduct confers an indirect, remote or incidental benefit on a religion, or that its effect merely happens to coincide or harmonize with the tenets of a religion." *Smith v. Board of Sch. Comm'rs*, 827 F.2d 684, 691 (11th Cir. 1987) (internal quotations omitted). Supreme Court precedent provides, once again, all the instruction we need here. In *Lynch*, the Court upheld the government's display of a crèche (a clearly religious symbol) where no evidence of any significant government expenditures to maintain the crèche or day-to-day interaction between church and state were found. 465 U.S. at 671. The court explained,

> to conclude that the primary effect of including the creche is to advance religion in violation of the Establishment Clause would require that we view it as more beneficial to and more an endorsement of religion, for example, than expenditure of large sums of public money for textbooks supplied throughout the country to students attending church-sponsored schools, *Board of Education v. Allen;* expenditure of public funds for transportation of students to church-sponsored schools,

> *Board of Education*, [330 U.S. 1 (1947)] . . . It would also require that we view it as more of an endorsement of religion than the Sunday Closing Laws upheld in *McGowan* v. *Maryland*, 366 U.S. 420 (1961); the release time program for religious training in *Zorach* v. *Clauson*, 343 U.S. 306 (1952); and the legislative prayers upheld in *Marsh* v. *Chambers*, 463 U.S. 783 (1983).

*Id*. at 681-82. Likewise, it is of no consequence that the events challenged here involved a request for prayer and a community-led vigil. Supreme Court precedent is unequivocal in its rejection of the "polarized view that any government reference to God or prayer has the effect of advancing religion." *Allen v. Consolidated City of Jacksonville*, 719 F. Supp. 1532, 1538 (M.D. Fla. 1989). Such a view, the court explained, would "necessitate the abolition of the National Day of Prayer, the elimination of 'under God' from our pledge of allegiance, the removal of 'in God we trust' from our currency and the removal of many other references and calls to 'God' and 'prayer' in our state and national affairs." *Id*. at 1538 (citing *Lynch*, 465 U.S. at 683; *Zorach v. Clauson*, 343 U.S. 306, 312 (1952)).

    The evidence presented in this case fails to support a violation of the second prong. Not only is there no evidence of financial support for the Vigil by the City,[16]

---

[16] Once again, the lower court relied upon the school prayer case of *Holloman*, *see* Order (Dkt. 88), at 35, as well as *Gilfillan v. City of Philadelphia*, 637 F.2d 924, 930-31 (3d Cir. 1980), as support for finding the primary effect was endorsement of religion. In *Gilfillan*, however, city expenditures were undisputedly provided to put on an event for the Pope who delivered a sermon and city officials met repeatedly

there is no evidence that any City official or employee planned or participated in the Vigil in any official capacity.[17] The event was held in a public square – not in a government building.[18] From the time the Vigil was announced to the community to the conclusion of the event, Chief Graham's communications with the public and his conduct consistently communicated that the Vigil was not a City or OPD event, but, instead, a community-led event. On several occasions, Chief Graham made clear that he was not leading the event or speaking at the event and that he would not and could not cancel the event. Further, when asked by a citizen who the speakers would be and/or whether different faiths would be represented at the

---

with the Archdioceses to discuss and participate in the planning of the event, including construction of the platform and the cross, and the Mass. *Id*. at 930. These activities, the court noted, were separate and apart from acceptable coordination with police and fire departments ahead of the event. *Id*. at 930-31. The case of *Newman v. City of East Point*, 181 F. Supp. 2d 1374 (N.D. Ga. 2002), is also inapposite. *See* Order at 40 (citing *Newman,* 181 F. Supp. 2d at 1380) (granting injunction against the city where evidence included a letter from the mayor on city letterhead inviting people to participate and soliciting donations and a memorandum from the mayor requesting reimbursement).

[17] Accordingly, the lower court's reliance upon *Hewett v. City of King*, 29 F. Supp. 3d 584, 635 (M.D.N.C. 2014), is misplaced. *See* Dkt. 88, at 35-36. In *Hewett*, the mayor personally delivered a religious message *in his official capacity*. In contrast, here, no city official or employee delivered religious messages and/or spoke at the Vigil. Only private citizens and faith leaders, including some volunteer chaplains, spoke at the event, and city officials did not have knowledge regarding the details of and/or control over who would speak and what they would say.

[18] *See* Dkt. 88, at 35-36 (citing *Milwaukee Deputy Sheriffs' Ass;n v. Clarke*, 588 F.3d 523, 528-29 (7th Cir. 2009), for the proposition that the second prong was violated where a sheriff invited a religious group to speak at *mandatory* employee meetings). In contrast, here, city officials had no part in extending invitations to speak, and the Vigil was a voluntary, community-led event – not a mandatory employee meeting.

event, Chief Graham offered to put that citizen in contact with the organizers of the event. The fact that Chief Graham was copied on emails discussing the scheduling/ rescheduling of the event, or that the event was announced at a police department meeting is inconsequential. [19]  As Chief Graham has testified, it was not out of the ordinary for the police department to remain informed of public events scheduled to take place in the City of Ocala. Typically, and as was the case for the Vigil, Chief Graham made sure there was a police presence at all events taking place in the public square. As Plaintiffs have confirmed, it was also standard for Chief Graham to invite citizens to attend public events and rallies in Ocala that were, in some way, associated with the interests of law enforcement. Plaintiffs have, in fact, confirmed this through their own testimony – *i.e.* that they received other invitations to rallies from Chief Graham, including an anti-bullying event.

Further, on the actual day of the event, no on-duty, uniformed OPD officers participated in and/or led the Vigil.[20] And while Edwards attended the event, he

---

[19] The lower court seems to find the fact that Chief Graham was copied on some emails regarding the date and time for the event evidence of Chief Graham's control over or participation in planning the event; however, this is an assumption not supported by the evidence. As stated above, it was not uncommon for Chief Graham to stay apprised of the details of upcoming public events.

[20] Plaintiffs presented, and the lower court noted, a picture alleging that an officer "appears to be participating in prayer while sitting on the edge of the stage." Dkt. 88, at 17 (citing Dkt. 54-19, at 9 (Page ID 1392). This pure assumption on the court's part and, to the contrary, upon zooming in on this picture, the police officer's eyes are open. She is not part of any circle of citizens praying, nor is she holding hands with any citizen - all customary when participating in prayer).

did so in plain clothes and in a personal capacity as a faith leader in the community.[21] Finally, while some of the participants in the event included volunteer chaplains, they wore a distinctly different uniform from OPD officers. Nowhere is it argued that Plaintiffs or any reasonably informed observer would be confused regarding a chaplain's responsibilities (as opposed to an officer employed by the police department and/or other City official). Indeed, a reasonably informed observer would understand that a chaplain carries out certain religious activities that no other government official would be permitted to do. And Plaintiffs admitted there was no confusion regarding their service as volunteers – not paid employees. Accordingly, any argument advanced by Plaintiffs in this case that the Facebook post and/or the volunteer chaplains' participation in the Vigil constitutes a violation simply because it might leave other observers with the wrong impression must fail. The Supreme Court has, in fact,

---

[21] In considering the second prong, the lower court seemingly fails to acknowledge there is a difference between the conduct of city officials acting in their *official* capacity and a police officer acting in his personal capacity as a private citizen while off-duty and in plain clothes. Edwards' participation on the day of the Vigil was undisputedly in plain clothes as a private citizen, not as an OPD officer. The court's reference to a preliminary draft of comments prepared by Edwards for the Vigil fails to suggest otherwise. *See* Dkt. 88, at 46, n.38. No evidence was offered that these comments were actually provided by Edwards at the Vigil. *See generally*, Dkt. 88. In fact, as Plaintiff Mr. Hale has testified, he does not recall hearing any mention of the Ocala police department from the stage. Once more, while the lower court notes emails to/from Edwards regarding the Vigil, *see* Dkt. 88, at 21, these emails also fail to establish that Edwards participated in any capacity other than a personal one.

expressly rejected this argument, explaining that even if some observers may still perceive that the city has aligned itself with a particular faith by permitting a religious display on its property, "our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action." *Lynch*, 465 U.S. at 683. Not every law that confers an indirect, remote, or incidental benefit upon religion is, for that reason alone, constitutionally invalid." *Id.* (expressly holding that the religious display in *Lynch* was "no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as 'Christ's Mass,' or the exhibition of literally hundreds of religious paintings in governmentally supported museums").

### 3. Defendants' conduct did not result in excessive government entanglement.

The third and final prong of the *Lemon* test considers whether the challenged action "fosters an excessive government entanglement with religion." *Bown v. Gwinnett Cnty. Sch. Dist.*, 112 F.3d 1464, 1473 (11th Cir. 1997). Such an entanglement may arise where government action involves "monitoring and overseeing religious affairs." *Marsh*, 463 U.S. at 798. *See also Bown*, 112 F.3d at 1473; *Nartowicz v. Clayton Cnty. Sch. Dist.*, 736 F.2d 646, 649 (11th Cir. 1984). The Supreme Court has described the type of monitoring violative of the entanglement prong as "comprehensive, discriminating, and continuing state

40

surveillance." *Mueller v. Allen*, 463 U.S. 388, 403 (1983). Minimal "day-to-day interaction between church and state" does not constitute excessive entanglement for purposes of the *Lemon* test. *Lynch*, 465 U.S. at 684. In *Lynch*, for example, the court upheld the lower court's ruling finding no "administrative entanglement" because while the city might own the crèche, "there is no evidence of contact with church authorities concerning the content or design of the exhibit," "[n]o expenditures for maintenance [were] necessary," and the display required very little "day-to-day interaction between church and state." *Id*.

In this case, the lower court summarily concluded that the City had failed this third prong holding "[e]ven without more, an invitation by a city police department encouraging the community's attendance at a Prayer Vigil entangles the government with religion." Dkt. 88, at 37. Such a conclusion is in direct conflict with well-established case precedent. As the cases cited above establish, the law is abundantly clear that under the proper circumstances, the government may allow prayer, call for prayer, participate in and even select individuals to offer prayer at official government functions. *See Am. Legion*, 139 S. Ct. at 2080-82 (listing numerous examples of the Establishment Clause's tolerance of prayer – *i.e.* prayers that open legislative meetings, invocations of the Deity in the public words of officials, references to God on government documents, buildings, etc.); *Williamson v. Brevard Cnty*, 928 F.3d 1296, 1317 (11th Cir. 2019) (noting that the "law is

41

abundantly clear that the [government] may allow sectarian prayer at the start of legislative sessions, just as the Supreme Court approved prayer in *Marsh* and again in *Galloway*, and as we have in *Pelphrey* and in *Atheists of Florida*") (collecting cases). The City's conduct here does not result in any such entanglement, especially where City officials did nothing more than work with community leaders in attempt to address a crime spree and encourage the community to attend a Vigil – something Chief Graham and the OPD did on a regular basis for a host of other events.

In sum, the lower court's decision in favor of Plaintiffs-Appellees in this case ignores long-standing precedent that government calls for prayer, government officials' participation in prayer, and government's mere association with religious activity does not, without more, run afoul of the Establishment Clause. The lower court failed to "distinguish between real threat and mere shadow." *Am. Legion*, 139 S. Ct. 2091 (Breyer, J. concurring) (quoting *Van Orden*, 545 U.S. at 704). The Establishment Clause does not require the government to abstain from any association with or participation in religious activity. Defendants' secular purpose was undisputedly clear here in addressing the crime spree and their cooperation with local community leaders (who then planned and led the Vigil) to convince witnesses to come forward to testify against the shooters does not constitute a violation of the Establishment Clause.

### III.   There Is No Evidence Supporting A Finding of Municipal Liability

In *Monell v. Department of Social Services,* 436 U.S. 658 (1978), the Supreme Court "held that local governments (and branches thereof) may not be held liable for constitutional deprivations on the theory of *respondeat superior.*" *Denno v. Sch. Bd.*, 218 F.3d 1267, 1276 (11th Cir. 2000). Rather, local governments "may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Id*. (citing *Monell*, 436 U.S. at 694) (other citations omitted). "In order for the actions of a government official to be deemed representative of the municipality, the acting official must be imbued with final policymaking authority." *Id* (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986)).

In this case, the Vigil was never considered for or held out to be an official government policy, none of Chief Graham's actions could be deemed to represent government policy, and the Vigil was a one-time event. Plaintiffs-Appellees cannot point to any persistent or wide-spread practice here. And while under limited circumstances a municipal liability may be imposed for a single decision by municipal policymakers, this case does not present such a scenario. There is no evidence here that Chief Graham *intentionally* deprived Plaintiffs of a federally protected right. *See Cooper v. Dillon*, 403 F.3d 1208, 1222 (11th Cir. 2005) ("Proof

that a municipality's . . . authorized decisionmaker has *intentionally* deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably") (citing *Board of the Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 405, (1997)). Therefore, there is no evidence to support a finding of municipal liability.

## CONCLUSION

This Court should vacate and remand, with instructions to dismiss the case for lack of jurisdiction. Alternatively, if the Court finds that Plaintiffs-Appellees have adequately established standing, the decision of the district court should be reversed and the case remanded for entry of summary judgment in favor of Appellant City of Ocala.

October 12, 2021                    Respectfully Submitted,

                                    /s/ Abigail Southerland
                                    Abigail Southerland*
                                    AMERICAN CENTER FOR LAW &
                                    JUSTICE
                                    625 Bakers Bridge Ave., St. 105-121
                                    Franklin, TN 37067
                                    Tel. (615) 599-5572
                                    Fax (615) 309-8832
                                    asoutherland@aclj.org

Christina A. Compagnone*
AMERICAN CENTER FOR LAW &
JUSTICE
201 Maryland Ave. NE
Washington, DC 20002
Tel. (202) 641-9168
cstierhoff@aclj.org

Francis Manion
AMERICAN CENTER FOR LAW &
JUSTICE
6375 New Hope Rd.
New Hope, KY 40052
Tel. (502) 549-7020
fmanion@aol.com


*Admitted to Eleventh Circuit Bar

*Counsel for Defendants/Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 32(g) because it contains 12,162 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that the attached brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

/s/ Abigail Southerland
Abigail Southerland*
AMERICAN CENTER FOR LAW
 & JUSTICE
625 Bakers Bridge Ave., St. 105-121
Franklin, TN 37067
Tel. (615) 599-5572
Fax (615) 309-8832
asoutherland@aclj.org

*Admitted to Eleventh Circuit Bar

*Counsel for Defendants/Appellant*

46

# CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit on October 12, 2021, using CM/ECF, which then served such filing upon the following registered counsel of record for Plaintiffs-Appellees:

Heather Morcroft, Esq.
331 S. Wyemore Road
Winter Park, FL 32789
Tel.: 407-325-0585
hmorcroft13@gmail.com

Monica L. Miller
American Humanist Association
1821 Jefferson Place NW, Washington,
DC 20036
(202) 238-9088
mmiller@americanhumanist.org

s/ Abigail A Southerland
Abigail Southerland*
*Counsel for Defendants/Appellant*

47